**WESTSIDE FORD, Inc. v. UNITED STATES.**

**No. 13392.**

United States Court of Appeals
Ninth Circuit.

July 27, 1953.

Bogle, Bogle & Gates, Robert W. Graham, Seattle, Wash., for appellants.

J. Charles Dennis, U. S. Atty., John H. Binns, Asst. U. S. Atty., Frederick P. Holbrook, Jr., Howard F. Frye, Attorneys, O.P.S., Seattle, Wash., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

In March of 1952 the Seattle District Office of Price Stabilization conducted an investigation of the business records of appellant, a corporation engaged in selling new and used automobiles in Seattle, Washington. On March 25, 1952, after agents had examined appellant's records for a period of about 10 days, the O.P.S. suggested that the records be microfilmed. Appellant, through its attorney, refused to permit this or any other further inspection of its records. The District Enforcement Director on March 26 issued a subpoena commanding the president of appellant to appear at the O.P.S. office and bring with him the documents relating to all sales of new automobiles and services performed thereon from December 19, 1950 to March 25, 1952. The subpoena was not obeyed. Appellee thereupon moved the district court for enforcement. After a hearing upon affidavits and oral argument the court entered an order requiring production of the desired records on appellant's premises for inspection, copying or photographing thereof. The corporation has appealed from this order.

The issues presented by appellant's many specifications of error may be broadly summarized as follows: (1) Did the O.P.S. officials comply with the requirements of statute and regulations in issuing the subpoena? (2) Was the order of the court too broad in scope or too indefinite in its demands? (3) Did the court err in authorizing inspection of documents on appellant's premises, when appellee had moved for enforcement of a subpoena demanding off-premises production of the documents? (4) Did the court have power to order production of records for *copying or photographing* thereof? (5) Has there been such harassment of appellant, or such an excess of administrative improprieties in the conduct of the investigation and issuance of the subpoena, as would warrant a denial of enforcement of the subpoena?

### Compliance By O.P.S. With Statute And Regulations

Appellant first contends that the administrative subpoena was void for failure of the O.P.S. to first serve upon appellant an "inspection authorization." We think not. A subpoena and an inspection authorization are two wholly separate and

independent means of obtaining information. One need not be availed of before resorting to the other. The President, (or his appointees) is given express authority .to issue subpoenas, enforceable by the district courts, by § 705(a) of the Defense·Production Act of 1950, as amended, 50 U.S.C.A.Appendix, § 2155(a). Under that section a subpoena may require a person "to appear and give testimony or to appear and produce documents, or both".

The instrument known as an inspection authorization is a creature of regulations issued to implement so much of § 2155(a) as empowers the President "by regulation" to "make such inspection of the books, records, and other writings, premises or property of * * * any person as may be necessary or appropriate, in his discretion, to the enforcement or the administration of this Act and the regulations or orders issued thereunder." Under Delegation of Authority 4, Supplement 1, 16 F.R. 3595 and Enforcement Procedure Regulation 1, 16 F.R. 2496, the District Enforcement Directors were authorized to sign and issue inspection authorizations requiring any person to permit O.P.S. representatives to inspect documents in the possession of said person at the place where they are usually kept, and to inspect the premises or property of said person. The power of the courts to enforce an inspection authorization stems from § 706(b) of the Defense Production Act of 1950, as amended, 50 U.S.C.A.Appendix, § 2156(b) which confers on the district courts jurisdiction to "enforce any liability or duty created by, or to enjoin any violation of, this Act or any rule, regulation, order, or subpoena thereunder." Cf. G. H. Love, Inc., v. Fleming, 9 Cir., 161 F.2d 726, certiorari denied 332 U.S. 790, 68 S.Ct. 98, 92 L.Ed. 372; Porter v. Gantner & Mattern Co., 9 Cir., 156 F.2d 886; Dossett v. Porter, 6 Cir., 161 F.2d 839, certiorari denied 332 U.S. 771, 68 S.Ct. 85, 92 L.Ed. 356.

■ The subpoena and the inspection authorization have only one element in common: they both are means of gaining access to documents. The subpoena may require the documents to be produced at any place, and may also compel the giving of testimony. The inspection authorization, which bears some resemblance to an ordinary search warrant, can only make documents available to investigators at the place where they are usually kept, but may also authorize inspection of premises and property. In considering a comparable investigative scheme, we have said that a subpoena and an "inspection requirement," to which the inspection authorization here under consideration is similar, were "alternative methods of seeking an order to inspect documents." Porter v. Gantner & Mattern Co., supra, 156 F.2d at page 890.

Appellant next contends that the subpoena was void because the O.P.S. failed to define the scope and purpose of the investigation before the subpoena was issued. Under 50 U.S.C.A.Appendix, § 2155(a) the President is required to insure that the powers of investigation granted by that section·shall be exercised "only after the scope and purpose of the investigation, inspection, or inquiry to be made have been defined by competent authority". Enforcement Procedure Regulation 2, § 2, 16 F.R. 2496, and Delegation of Authority 4, Supplement 1, supra, required that the District Enforcement.Directors define the scope and purpose of the inquiry before issuing subpoenas.

The record reveals that on March 10, 1951, a day before the investigation was commenced and 16 days before the subpoena was issued, John Binns, the District Enforcement Director, filled out O.P.S. Form No. 228, entitled "Investigation, Inspection or Inquiry, Purpose and Scope," which stated in substance that the purpose of the inquiry was to determine whether appellant was complying with "Para 3 of SR 5 of GCPR and CPR 83," and that the inquiry would include the examining and copying of documents required to be kept by the Act or regulations, the interviewing of persons believed to have pertinent information, the inspection of the premises and property of such persons, and such further investigation as the Director might deem necessary and appropriate.

It is urged that the Director's statement was so sweeping as to be no definition at all, since the expressed purpose was to deter-

mine all conceivable questions of violation of ceiling price regulations, and the stated scope comprehended investigation of any and all transactions of appellant relating to new automobiles. The breadth of the Director's definition of scope and purpose is substantially as appellant asserts. Section 3 of SR 5 (General Ceiling Price Regulation, Supplemental Regulation 5, 16 F.R. 1769) laid down a rather complex formula for determining the retail ceiling prices of new automobiles. It provided that the ceiling price should consist of the "manufacturers' suggested list price" plus several charges to cover specified services, special equipment and items of cost. CPR 83 (Ceiling Price Regulation 83, 16 F.R. 10594) superseded SR 5 on October 15, 1951, and was similar to SR 5 in its ceiling price provisions, except that a defined "basic price" was substituted for the manufacturers' suggested list price. The two regulations exhausted the field of ceiling price regulations for retail sales of new automobiles during the effective periods of each.

■ We are of the opinion, however, that the Director's statement of scope and purpose was a sufficient compliance with the Act. The powers of investigation of the O.P.S. under 50 U.S.C.A.Appendix, § 2155 (a) are sufficiently broad to authorize an investigation of the scope outlined by the Director. A wide range in investigation is necessary where, as here, the ceiling price regulations are exceedingly complex and the possibilities of violation or evasion so unlimited that the precise manner of violation cannot ordinarily be known or even suspected in advance. In such a case, there is no impossible requirement of meticulous pinpointing of narrow objectives and subjects of investigation.

■ It is further contended that the subpoena was void for failure of the O.P.S. to serve the definition of scope and purpose upon appellant prior to issuance of the subpoena. The answer to this is simply that the Act and regulations do not require such a service. But, says appellant, the only conceivable purpose of the requirement is to inform the person whose documents are to be investigated as to what is desired by the Director. Appellant is mistaken. If this is the purpose, then the requirement is unnecessary and duplicitous, for it is the subpoena itself that tells what documents are required. Doubtless the purpose of the requirement was to induce restraint in the exercise of the agency's very extensive investigative powers and prevent dissipation of time and effort in aimless investigations by compelling a responsible official to make articulate the objective and extent of each projected inquiry. Intra-agency procedures designed for such purposes have been previously considered by this court. See National Labor Relations Board v. J. I. Case Co., 9 Cir., 201 F.2d 597.

## Was The Order Too Vague Or Too Broad?

■ We turn now to the questions whether the order of the court meets the tests of specificity and relevancy.[1] An order to produce documents may constitute a

---

[1] Appellant attacks both the subpoena as issued by the Director and the court's order on these grounds. We confine our inquiry to the court's order, for it varies substantially from, and is narrower than, the Director's subpoena and only the order of the court is before us for review. Cf. Hagen v. Porter, 9 Cir., 156 F.2d 362, 366. Appellant advances the argument that since the court had power to enforce the subpoena only if it was disobeyed, a valid subpoena was a prerequisite to enforcement by the court. Therefore, says appellant, we must reverse the court's order if the subpoena was too indefinite or too broad, even though the order of the court be unobjectionable on these grounds. We do not agree. Courts have often and as a matter of course modified, and, as modified, enforced subpoenas presented to them for enforcement, where the subpoenas were unduly broad or oppressive. See, e.g., Hagen v. Porter, supra; Walling v. American Rolbal Corp., 2 Cir., 135 F.2d 1003, 1005; Porter v. Clayton Packing Co., D.C.E.D.N.Y., 65 F.Supp. 825. What appellant would have us do is this: We should reverse the court's order if the administrative subpoena is too broad or too vague, though the court's order itself is proper. In logical sequence, the O.P.S. would then issue a subpoena drawn in the same terms as the lower court's order. If not obeyed,

constructive "unreasonable search and seizure" in violation of the Fourth Amendment if it is too indefinite in its demands, Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 502, 90 L.Ed. 614; Hagen v. Porter, 9 Cir., 156 F.2d 362, certiorari denied 329 U.S. 729, 67 S.Ct. 85, 91 L.Ed. 631; Bowles v. Abendroth, 9 Cir., 151 F.2d 407; or if documents demanded are irrelevant or immaterial to the purpose of the inquiry, Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Oklahoma Press Publishing Co. v. Walling, supra; Provenzano v. Porter, 9 Cir., 159 F.2d 47, certiorari denied 331 U.S. 816, 67 S.Ct. 1303, 91 L.Ed. 1834; Bowles v. Beatrice Creamery, 10 Cir., 146 F.2d 774; Goodyear Tire & Rubber Co. v. National Labor Relations Board, 6 Cir., 122 F.2d 450.

 The order of the court below is set out in the margin.[2] As to its alleged indefiniteness, appellant objects only to so much thereof as requires production of "any other records" containing specified items of information. The information sought is specific and plainly stated. The order is at least as definite as that involved in the Oklahoma Press Publishing case, supra, where the Supreme Court said that "the specifications more than meet the requirements long established by many precedents." 327 U.S. at pages 210, 211, 66 S.Ct. at page 506; see also the inspections authorized in

Bowles v. Northwest Poultry & Dairy Products, 9 Cir., 153 F.2d 32; Porter v. Murray, 1 Cir., 156 F.2d 781, dismissed 330 U.S. 804, 67 S.Ct. 963, 91 L.Ed. 1262.

Nor are the demanded documents irrelevant to the purpose of the inquiry. "The standards of materiality or relevancy are far less rigid in an ex parte inquiry to determine the existence of violations of a statute, than those applied in a trial or adversary proceedings." Hagen v. Porter, supra, 156 F.2d at page 365. And the existence of probable cause for believing the Act has been violated is not a prerequisite to an inspection. Oklahoma Press Publishing Co. v. Walling, supra; Mines & Metals Corp. v. Securities & Exchange Comm., 9 Cir., 200 F.2d 317; Hagen v. Porter, supra; Bowles v. Glick Bros. Lbr. Co., 9 Cir., 146 F.2d 566, certiorari denied 325 U.S. 877, 65 S.Ct. 1554, 89 L.Ed. 1994, rehearing denied 326 U.S. 804, 66 S.Ct. 12, 90 L.Ed. 490; Dessett v. Porter, supra. The materiality of the records of sales and the breakdown of the selling price into its component parts is so plain as to require no comment. Such records were required to be kept by the regulations. See General Ceiling Price Regulation, § 16, 16 F.R. 808; SR 5, § 6, supra; CPR 83, § 13, supra; cf. G. H. Love, Inc. v. Fleming, supra, 161 F.2d at page 728; Bowles v. Glick Bros. Lbr. Co., supra, 146 F.2d at pages 570, 571; Bowles v. Insel, 3 Cir., 148 F.2d 91, 92–94.

this subpoena would be enforced by an order of the court below identical to the one now before us. On appeal to us, we would then affirm an order identical to the one we now reverse. There is no reason for such circumlocution.

2. "It is hereby ordered that Ralph E. Malone, President, Westside Ford Company, Inc., is directed and required to produce and permit the inspection and copying or photographing of the following designated new car records for the period December 19, 1950, to the present date which are in his possession, custody, or control: Customer invoices, car invoices, customer purchase orders, conditional sales contracts, repair orders, records which indicate cost of labor and materials expended in the preparation and conditioning of new cars for delivery, ceiling price lists effective after January 26, 1951, and any other records not specified

above which contain the following information as to new cars sold: (a) Date of sale. (b) Make of automobile, model, year and body style, motor number and serial number. (c) Basic price, transportation charge, preparation and conditioning, Federal excise tax, charge for extra, special, or optional equipment. (d) State and local taxes. (e) Charge for other services or items of equipment requested. (f) Finance charges, name of finance company, method of payment and amount of cash received;

"Provided that such inspection does not authorize microfilming of records and;

"Provided further that the production of the said records or other documentary evidence shall be required at the premises of respondent at 3922 West Alaska Street, Seattle, during the reasonable business hours of respondent, commencing on April 23, 1952, and continuing until June 1, 1952."

 The relevancy of appellant's "repair orders" and "records which indicate cost of labor and materials expended in the preparation and conditioning of new cars for delivery" is not so clear.[3] As nearly as can be gathered from the record, the repair orders sought pertain to repairs made without special charge to buyers of new automobiles, and the arguments of the parties proceed upon the assumption that these repairs are a part of the dealer's "preparation and conditioning" service. A charge for preparation and conditioning was one of the several elements which made up the ceiling price for retail sales of new automobiles. See SR 5, § 3(f), supra, and CPR 83, §§ 2(a) (6) and 7, supra. A ceiling price was placed upon this service, which under SR 5 was the highest price charged during a base period from December 19, 1950 to January 25, 1951, and under CPR 83 was the price charged or, if records of the price were not kept, the cost of the service during a base period from January 26, 1951 to February 24, 1951. See Interpretation 2 to CPR 83, 17 F.R. 5117.

The government seeks to justify the demand for the records of the cost of the service on the ground that, under the regulations, a dealer may charge for this service *only if it is actually rendered.* See CPR 83, § 7. We are told that frequently dealers made charges for "phantom services" never in fact rendered, and that whether appellant was guilty of this prac-

tice can only be determined from its cost records.

Appellant, on the other hand, argues that the rendering of some preparation and conditioning services by dealers in new automobiles is inevitable. It is urged that the regulations were aimed not at profit control, but at price control, and that the only appropriate inquiries are (1) as to the prices charged or, possibly, the cost to appellant of the service, *during the base periods,* which prices or costs established the ceiling prices for the service; and (2) whether during the effective periods of SR 5 and CPR 83 appellant charged in excess of the applicable price ceilings. Whether and to what extent the services were rendered after the base periods, says appellant, is wholly irrelevant.

There is some plausibility in appellant's argument. It appears to be supported by Interpretation 2 to CPR 83, supra. But this is not the time to resolve the question. From the regulations, the record and arguments, it is not at all clear just what is included in the phrase "preparation and conditioning." We know nothing of appellant's servicing and pricing practices in this regard. On its face § 7 of CPR 83 prohibits charges for preparation and conditioning *when the service is not rendered.* Appellant's construction of this provision would render it virtually meaningless. We are not prepared to construe the provision in a vacuum, and say that under no con-

3. Appellant argues that these records are not required to be kept by the regulations. In this appellant is substantially correct. The only cost records required to be maintained appear to be those pertaining to the base period under the General Ceiling Price Regulation, December 19, 1950 to January 24, 1951. See GCPR, § 16, supra; SR 5, § 6, supra; CPR 83, §§ 10, 13, supra. But this does not mean that cost records for later periods cannot be subjected to investigation. That records are required to be maintained may impress them with a quasi-public character, and thus make lawful an investigation thereof which might be unlawful under the Fourth or Fifth Amendments if applied to purely private papers. See Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771;

Bowles v. Insel, 3 Cir., 148 F.2d 91; Bowles v. Glick Bros. Lbr. Co., 9 Cir., 146 F.2d 566, certiorari denied 325 U.S. 877, 65 S.Ct. 1554, 89 L.Ed. 1994, rehearing denied 326 U.S. 804, 66 S.Ct. 12, 90 L. Ed. 490. But where the documents are relevant to an inquiry conducted for a lawfully authorized purpose, as here, the Fourth Amendment is no bar to their inspection, whether they be of a quasi-public character or purely private. In such a case the only valid ground of objection is the self-incrimination privilege, which is unavailable to appellant, a corporation. United States v. White, 322 U. S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542; Oklahoma Press Publishing Co. v. Walling, 327 U.S. at page 197, 66 S.Ct. at page 499, 90 L.Ed. 614.

struction of the provision, and under no conceivable state of facts, could appellant be found to have violated the provision by making charges *for services not rendered.* When the facts are known, the meaning and applicability of the provision may become plain. It is not impossible that such facts will disclose a violation. No more need be said to sustain the demand for the cost records in question.

### Copying Or Photographing Of Records

■ Appellant contends that so much of the order as requires production of its records for "copying or photographing" thereof exceeds the investigative authority of the O.P.S. under 50 U.S.C.A.Appendix, § 2155(a). That section provides in pertinent part that the "President shall be entitled * * * by regulation, subpena or otherwise to obtain such information from * * * *make such inspection of* the books, records, and other writings, premises or property of * * * any person as may be necessary or appropriate, in his discretion * * *." (Emphasis ours.)

That this broad language should make available to the President and his appointees so usual and indispensable an investigative device as the copying of documents would seem self-evident. Appellant attempts to work out a contrary construction by reference to § 202(b), Emergency Price Control Act of 1942, 56 Stat. 30, as amended, formerly 50 U.S.C.A.Appendix, § 922, which conferred express authority to copy documents. The omission of this from the Defense Production Act of 1950, says appellant, is significant. Appellant further calls attention to 50 U.S.C.A.Appendix, § 2155(c), which forbids requiring off-premises production of documents if true copies thereof are furnished by the owner, and emphasizes that this is the sole reference in the Act to copying of documents.

We are not impressed with the argument. The construction urged by appellant would mean that investigators may look at documents but may not record what they see; that they must commit to memory hundreds of documents, with long columns of figures, to determine complex questions whether the regulations have been violated or evaded. This reductio ad absurdum is a sufficient answer to appellant's argument. Rightly construed § 2155(a) gives the President or his appointees discretion as to the *means* of investigation as well as the subjects of investigation.

### On-Premises Inspection Of Documents

■ Appellant contends that because the order of the court below authorized inspection of documents on appellant's premises, when appellee had moved for enforcement of a subpoena requiring off-premises production of the documents, the order was erroneous, in that (1) the order constituted a substitution of the court's judgment for that of the Director of Enforcement, when such determination had been entrusted by Congress to the latter; and (2) the order exceeded the scope of the pleadings, prayer and record, and therefore denied appellant due process of law.

The short answer to appellant's first argument is that it is for the government, and not appellant, to object, if the court granted less than the government asked and thereby, as appellant contends, "usurped" the function of the O.P.S. to determine the means of investigation. Appellant has no standing to complain of the court's order on this ground.

As to the second point, the argument is that appellant was required to defend against a motion for enforcement of a subpoena and has now been subjected to an order enforcing what is in effect an inspection authorization. This, we are told, was a denial of due process of law. The argument is without merit. Subpoenas may require the production of records at any place. They often compel production of documents at the place where usually kept. See Porter v. Gantner & Mattern Co., supra, 156 F.2d at page 890; Walling v. American Rolbal Corp., 2 Cir., 135 F.2d 1003, 1005. The order of the court exceeded the scope of the pleadings and record only as regards the place of production of the records, a minor variance which could hardly be denominated a denial of due process. And appellant has shown no prejudice to it by the modification of the subpoena. Indeed, the modification was

wholly for appellant's benefit. Appellant has asserted that it was only when the O.P.S. asked to remove its records that objection was made, and that assent to an on-premises inspection might have been granted. Strangely, appellant now objects to the modification of the subpoena to accord with its own professed desires. The argument puts appellant in the position of one who would invoke the due process clause when sued for $10,000 and found liable for only $5,000.

### Administrative Improprieties And Harassment

Finally, appellant argues that the cumulative effect of the administrative misconduct and the harassment to which it has been subjected should move this court to withhold sanctioning further investigation. We are not advised of any rule that enforcement of a lawful subpoena should be denied on account of some antecedent administrative "impropriety." But if there were such a rule, a careful reading of the record discloses no conduct of the O.P.S. officials that would move us to invoke it. And enforcement of a lawful subpoena will not be denied because it causes inconvenience or harassment. Oklahoma Press Publishing Co. v. Walling, supra; Bowles v. Abendroth, supra; Application of Compton, D.C.N.D.Tex., 101 F.Supp. 547.

The order is affirmed.